UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------X
PATRICIA KIJAK and CHRISTINA KIJAK,

                   Plaintiffs,

      - against -             **MEMORANDUM & ORDER**

COLUMBIA PRESBYTERIAN HOSPITAL a/k/a    11 Civ. 6076 (NRB)
NEW YORK PRESBYTERIAN HOSPITAL and
CITY OF NEW YORK,

                  Defendants.
---------------------------------------X
**NAOMI REICE BUCHWALD**
**UNITED STATES DISTRICT JUDGE**

    Plaintiffs Patricia Kijak and Christina Kijak (collectively, "plaintiffs") originally brought this action against Columbia Presbyterian Hospital ("Columbia Presbyterian"), which settled with plaintiffs on March 19, 2012, and the City of New York (the "City"), alleging negligence, violations of the New York State Public Health Law, sections 4200-4202 and 4209-4214, and violation of the common law right of sepulcher in connection with the burial of their decedent, Jessica Kijak.  Presently before the Court is the City's motion for summary judgment.  For the reasons that follow, we grant summary judgment in favor of the City.

**BACKGROUND[1]**

---
[1] The following facts are drawn from the City's Rule 56.1 Statement of Undisputed Facts ("Def. 56.1"); plaintiffs' Rule 56.1 Counterstatement ("Pl. 56.1"); the Memorandum of Law in Support of the City's Motion for Summary

## I. __Factual Background__

In 1999, then twenty-year-old Jessica Kijak was arrested for possession of drug paraphernalia in her hometown of Kinnelon, New Jersey. (Deposition of Christina Kijak, Fabian Decl. Ex. B ("C. Kijak Dep."), at 9-10.) In connection with that arrest, Jessica was required to attend mandatory drug rehabilitation for her heroin addiction. However, she refused to do so, and after several attempts by her family to compel her compliance with the court's mandate, Jessica ran away from home. (C. Kijak Dep. at 8; Deposition of Patricia Kijak, Fabian Decl. Ex. C ("P. Kijak Dep."), at 23.)

From 1999 until the date of her death in 2008, Jessica had no contact with her family. (P. Kijak Dep. at 24.) Plaintiffs Christina Kijak, Jessica's mother, and Patricia Kijak, Jessica's sister, went to great lengths to locate her, including retaining a private investigator, traveling to Puerto Rico based upon information suggesting that she might be there, and periodically visiting methodone clinics in lower Manhattan. (C. Kijak Dep. at 39-41; P. Kijak Dep. at 22, 24, 26-27.) Despite these

---

Judgment ("Def. Mem."); the Declaration of Sosimo J. Fabian in Support of the City's Motion for Summary Judgment ("Fabian Decl.") and the exhibits annexed thereto; plaintiffs' Memorandum of Law in Opposition to the City's Motion for Summary Judgment ("Pl. Mem.") and the exhibits annexed thereto; and the City's Reply in Support of its Motion for Summary Judgment ("Def. Reply Mem.") and the exhibits annexed thereto.

efforts, plaintiffs were never able to locate Jessica.  (Def. 56.1 ¶ 6.)

On December 30, 2007, Jessica entered the Emergency Department at Columbia Presbyterian Hospital's Allen Pavilion in Manhattan, New York.  (Def. 56.1 ¶¶ 7-8; <u>see</u> Medical Records, Fabian Decl. Ex. D.)  It is unclear exactly what conditions she presented with at that time.  (<u>Id.</u>)  According to her medical records, she gave Columbia Presbyterian her name and current address, but did not provide any information concerning her next of kin.[2]  (Fabian Decl. Ex. D.)  She had no forms of identification or other identifying documents on her person. (<u>See</u> Deposition of Rosemary Anzalone, Fabian Decl. Ex. E ("Anzalone Dep."), at 17.)

On January 3, 2008, Jessica died at Columbia Presbyterian from complications arising from chronic intravenous drug use. (<u>See</u> Fabian Decl. Ex. D.)  Columbia Presbyterian reported Jessica's death to the Office of the Chief Medical Examiner (the "OCME") that same day.  (<u>See</u> <u>id.</u>)  Because there were no identifying documents accompanying the body, Columbia

_____

[2] As the City concedes, Columbia Presbyterian failed to provide a complete copy of Jessica's medical records, representing to them that certain of the records could not be located and therefore had been presumed lost.  (<u>See</u> Def. 56.1 ¶ 9 & n.1; Def. Mem. at 4 n.1.)  While plaintiffs contend that it is therefore unclear whether Jessica provided the names of any next of kin to Columbia Presbyterian Hospital (<u>see</u> Pl. 56.1 ¶ 7), it is indisputable that the next of kin section of the extant portion of her medical records was left blank, while all the other sections on that document were completed.  (<u>See</u> Fabian Decl. Ex. D.)

Presbyterian was unable to verify her identity.  (See Anzalone Dep. at 17.)

It is undisputed that Columbia Presbyterian made no further efforts to locate or contact Jessica's next of kin.  (Hospital Records, Fabian Decl. Ex. F.)  Moreover, there is no evidence in the record that hospital personnel, being in possession of an unclaimed body with no known next of kin, contacted the New York Police Department (the "NYPD").  (See Def. 56.1 ¶ 13.)  Thus, Columbia Presbyterian referred Jessica's body to the OCME without verifying that she was, in fact, the person she identified herself to be upon admission.[3]

On January 4, 2008, one day after her death, the OCME performed an autopsy on Jessica.  (See Autopsy Report, Fabian Decl. Ex. I, at 1.)  On January 23, 2008, because no one had yet come forward to claim Jessica's body, the OCME prepared a death certificate which stated that Jessica Kijak was the "unverified decedent's legal name."  (Fabian Decl. Ex. J.)  Six days later, the New York City Department of Health and Mental Hygiene issued a permit to dispose of Jessica's remains.  (See Fabian Decl. Ex. K.)  Two days after that, on January 31, 2008, an OCME employee

---

[3] Columbia Presbyterian Hospital protocols distinguish between non-medical examiner and medical examiner cases.  (See Columbia Presbyterian Hospital Protocols, Fabian Decl. Ex. G, §§ 1(C), (F) and 2(A).)  A hospital must refer a death to the OCME when there is some criminality implicated in the circumstances of death.  Thus, Columbia Presbyterian was required to notify the OCME upon Jessica's death.  (See Pl. 56.1 ¶ 13.)

named Sharon Trotman confirmed to supervisory staff that there was "no family or medical information list[ed] in the case folder" for Jessica.  (See Fabian Decl. Ex. L.)

On February 7, 2008, the OCME contacted the Public Administrator of New York County, New York, to inform that office that it was in possession of an unclaimed, unverified body.  (See Fabian Decl. Ex. M.)  The NYPD took and processed Jessica's fingerprints on February 17, 2008 to ascertain whether there were any open warrants with respect to her. (See Deposition of Detective Robert Bourne, Fabian Decl. Ex. N ("Bourne Dep."), at 11-12, 14.  The NYPD then used Jessica's fingerprints to confirm that the body had not been claimed for burial.  (See id. at 19.)  At or about the same time, the NYPD conducted a search for Jessica's identity on the Automated Missing Persons System ("AMPS"), the results of which were negative.  (See id. at 15, 30-31.)  However, as plaintiffs acknowledge, Jessica had not been reported as a missing person to the State of New York or the U.S. Department of Justice.[4] (See id.)

On March 11, 2008, the New York County Public Administrator transferred the matter to the Bronx County Public Administrator

---

[4] Although not known to defendants or the NYPD at the time, plaintiffs had reported Jessica as a missing person to a non-governmental organization called "The Doe Network," as well as to the New Jersey Police Department. (See Fabian Decl. Ex. O.)

(the "Public Administrator") because the address Jessica gave to Columbia Presbyterian was located in the Bronx, New York. (See Fabian Decl. Ex. P.)    The Public Administrator thereafter "assumed the administration of goods, chattels and credits of Jessica Kijak" on March 12, 2008. (See Fabian Decl. Ex. Q.)  As is its routine practice, it further filed an official change of address and forwarding order with the U.S. Postal Service, directing all correspondence sent to Jessica to be forwarded to its office in order to intercept any mail from putative relatives. (See Deposition of Russell Heit, Fabian Decl. Ex. S ("Heit Dep."), at 24.)    The Public Administrator further prepared a memorandum for its investigative staff, directing them to "please go to [Jessica's] apartment and make an investigation."  (Fabian Decl. Ex. T.)    The memorandum specifically noted that the office was "looking for names and addresses of possible family members." (Id.)

Accordingly, on March 19, 2008, Russell Heit, Senior Investigator for the Office of the Public Administrator, went with other staff members to Jessica's given address in the Bronx to conduct an investigation. (See Heit Dep. at 15.)  There, Heit met Irvin Perez, a purported friend of Jessica's and the current tenant at the apartment located at the Bronx address. (See id. at 31.)  Perez reported to the investigators that

Jessica had lived with him previously, but that her father, "John Kijak of Patterson, New Jersey," had picked Jessica up around December 2007 and took possession of her items from the apartment at that time.[5]   (See Fabian Decl. Ex. T.)   Heit testified that, because Perez was the leaseholder at the Bronx address, investigators could not enter or further inspect the apartment for assets belonging to Jessica.  (See Heit Dep. at 31.)   However, it is unclear whether the investigators asked Perez if they could enter the apartment and whether he refused them access.  (See Pl. 56.1 ¶ 34.)

Based upon the above investigation, the Public Administrator concluded that there were no reasonably available family members to claim Jessica's body and no funds available to provide for her burial.  (See Heit Dep. at 31.)   On March 20, 2008, the Public Administrator released its statutory hold on Jessica's body and authorized her burial in the City's cemetery, located on Hart's Island.  (See Deposition of Kelly Espinal, Fabian Decl. Ex. U ("Espinal Dep."), at 46-47.)   The OCME made the necessary arrangements for burial, based upon its belief that the Public Administrator is legally authorized to direct the disposition of a body under section 4201 of New York's Public Health Law.  (See Fabian Decl. Ex. W.)   Accordingly, on

---

[5] Perez's statement is curious given that John Kijak had been deceased for many years, a fact obviously not known to the investigators at the time. (See Def. 56.1 ¶ 33 n.2.)

March 25, 2008, 82 days after her death, Jessica's body was buried in the City's cemetery. (See Fabian Decl. Ex. X.)

On February 10, 2011, Christina Kijak learned from the Kinnelon, New Jersey Police Department that Jessica had been buried in the City's cemetery. (See Fabian Decl. Ex. Y.) The circumstances under which this information came to light are somewhat unclear. The Kinnelon Police apparently learned of Jessica's burial from the NYPD (see id. at 2), who had made a connection between Jessica Kijak and Jessica Taylor, a pseudonym she occasionally used. (See Email from Scott Smith to Matthew Solari, Fabian Decl. Ex. Z, at 1.) On June 21, 2011, the NYPD was able to confirm that Jessica's fingerprints matched those associated with Jessica Taylor, who was registered with the NYPD under N.Y.S.I.D. number 0423776. (See id.)

Upon learning of the circumstances of Jessica's death and burial, plaintiffs commenced the process of disinterring her body from the City's cemetery. (See C. Kijak Dep. at 50-51; P. Kijak Dep. at 46, 49.) Jessica's body was thereafter transported to New Jersey, where her family held a funeral and ceremonial burial in March 2011. (See P. Kijak Dep. at 50-51.)

## II.  Relevant Municipal Entities

### A. Office of the Chief Medical Examiner

The OCME serves two primary functions.  First, it serves as the medical examiner and performs investigations to determine the cause and manner of all deaths that occur within its jurisdiction.  It arranges for the transportation of bodies from their place of death to the appropriate borough office, where an assigned medical examiner determines the necessary testing and performs an autopsy where appropriate.  The borough office then stores the remains until they are claimed, usually by a funeral home, for final disposition.

Under section 4201 of the New York Public Health Law, the OCME must report to the relevant District Attorney's Office or other prosecutorial entity any death wherein there is an indication of criminality.  The OCME also reports certain information to the New York City Department of Health and Mental Hygiene where necessary for public health purposes.

Second, the OCME serves as the mortuary for New York City. In this role, it transports bodies from their place of death and stores them pending final disposition.

**B. Office of the Public Administrator**

The Office of the Public Administrator is a legally mandated office of county government for every county in New York City.  Each of the boroughs of New York City has its own

Office of the Public Administrator, which handles the estates of persons who died domiciled in their respective counties.

Pursuant to New York State probate law, the Public Administrator's primary responsibility is to administer estates that would otherwise remain un-administered. See Office of the New York Probate Attorney, Function of the Public Administrator's Office, New York Probate Attorney, available at http://www.nycprobate.com/20543.html (last visited Sept. [XX], 2013). Among the duties designated to the Public Administrator is the responsibility to make appropriate burial arrangements when no close relative or next of kin is available to make such decisions, and to conduct thorough investigations to recover a decedent's assets for probate purposes. See id.

### III. **Procedural Background**

On August 30, 2011, plaintiffs filed their complaint, alleging that defendants acted negligently because they "made no efforts to contact the next of kin of Jessica Kijak and buried her some time after her death on Heart's [sic] Island." (See Compl. ¶ 9, Fabian Decl. Ex. A.) That negligence, plaintiffs allege, violated their common law right of sepulcher by depriving them "of their right to dispose of their loved one's remains as the [sic] wished in a timely fashion." (Id. ¶¶ 11-12.) Plaintiffs also allege violations of certain sections of

New York's Public Health Law ("PHL"), which require notification of death to the decedent's next of kin and specify conditions that must be met before the disposition of a decedent's body. (See id. ¶¶ 15-18.)

The parties completed fact discovery on September 21, 2012. Despite allotted time to do so, neither party engaged an expert witness.

On February 28, 2013, the City filed the instant motion for summary judgment.  Plaintiffs opposed that motion on March 15, 2013, and the City filed its reply on April 10, 2013.

### DISCUSSION

### I. Legal Standard

A motion for summary judgment is appropriately granted when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  In this context, "[a] fact is 'material' when it might affect the outcome of the suit under governing law," and "[a]n issue of fact is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." McCarthy v. Dun & Bradstreet Corp., 482 F.3d 184, 202 (2d Cir. 2007) (internal quotation marks omitted).  When making this determination, "we are required to resolve all ambiguities and draw all permissible factual inferences in favor of the party

11

against whom summary judgment is sought." <u>Gorzynski v. JetBlue Airways Corp.</u>, 596 F.3d 93, 101 (2d Cir. 2010) (citing <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 255 (1986)).

On a motion for summary judgment, "[t]he moving party bears the initial burden of demonstrating 'the absence of a genuine issue of material fact.'" <u>FDIC v. Great Am. Ins. Co.</u>, 607 F.3d 288, 292 (2d Cir. 2010) (quoting <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986)).   Where that burden is carried, the nonmoving party "must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." <u>Id.</u> (citing <u>Anderson</u>, 477 U.S. at 249).   The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts and may not rely on conclusory allegations or unsubstantiated speculation." <u>Brown v. Eli Lilly & Co.</u>, 654 F.3d 347, 358 (2d Cir. 2011) (internal quotation marks and citation omitted).

II.   **Analysis**

The City moves for summary judgment on three separate grounds.   First, it argues that plaintiff has failed to plead and prove the existence of a special duty, as required when a negligence claim pertains to a municipal defendant's performance of a governmental function.   Second, even assuming <u>arguendo</u> that plaintiffs could establish such a special duty, the City argues

that plaintiffs' negligence claims must fail because the Public Administrator is immune from liability for his discretionary decision to authorize the disposition of Jessica's remains. Finally, the City contends that plaintiffs assert no viable claim for loss of sepulcher because the Public Administrator made reasonable efforts to locate Jessica's next of kin and, finding no available family members to take responsibility for her, acted within its statutory authority by authorizing her burial at the City's cemetery.   We address each of these arguments in turn.

1. **Plaintiffs cannot prove the existence of a special relationship sufficient to establish a duty owed to them by the City.**

Under the "public duty rule," a municipality's general duty to the public does not create a tort duty running to a specific individual sufficient to support a negligence claim unless the plaintiff can demonstrate that a special duty was created.   This principle is derived from the more general proposition that "[t]o sustain liability against a municipality, the duty breached must be more than that owed the public generally." Lauer v. City of New York, 95 N.Y.2d 95, 100 (N.Y. 2000); see also Johnson v. Jamaica Hosp., 62 N.Y.2d 523, 527 (N.Y. 1984). Accordingly, a municipality can avoid liability in a negligence action if the plaintiff fails to establish that it was owed a

special duty of care.  See Valdez v. City of New York, 18 N.Y.3d 69 (N.Y. 2011).

A special relationship requires: "(1) an assumption by the municipality, through promises or actions, of an affirmative duty to act on behalf of the party who was injured; (2) knowledge on the part of the municipality's agents that inaction could lead to harm; (3) some form of direct contact between the municipality's agents and the injured party; and (4) that party's justifiable reliance on the municipality's affirmative undertakings." Lauer, 95 N.Y.2d at 102 (quoting Cuffy v. City of New York, 69 N.Y.2d 255, 260 (N.Y. 1987)).  The direct contact and reliance requirements are particularly important, as they "rationally define and limit" the class of individuals to whom the municipality's special duty extends.  Id.

Applying the above standards, we conclude that plaintiffs cannot establish that the City owed them any special duty other than that owed to the general public.  First, we find that the challenged actions constitute governmental functions warranting the application of the special duty analysis.  The gravamen of plaintiffs' complaint is that the City, being in possession of Jessica's name and that of her father, "simply failed" to follow up on that information and locate her next of kin.  (See Pl. Opp'n at 4.)  Thus, plaintiffs' claim is essentially one of

14

negligent investigation, which the Appellate Division of the New York State Supreme Court has recognized implicates governmental functions. See Gabriel v. City of New York, 89 A.D.3d 982, 983 (2d Dep't 2011); Scheuer v. City of New York, 10 A.D.3d 272, 273 (1st Dep't 2004); Tango v. Tulevech, 61 N.Y.2d 34, 40-42 (N.Y. 1983); see also Nash v. City of New York, 2003 N.Y. Slip Op. 51347(U), 2003 WL 22455641, at *3 (N.Y. City Civ. Ct. Oct. 21, 2003).

Having established that the investigation of Jessica's next of kin constituted a governmental function, we find that plaintiffs fail to plead or otherwise establish that the City owed them any special duty in the performance of that investigation. First, neither the OCME nor the Public Administrator ever undertook to act on plaintiffs' behalf, nor did they make any promises or assurances that they would locate Jessica's next of kin. Indeed, plaintiffs' allegations arise because the City failed to identify them as Jessica's next of kin. Given that the City did not know who plaintiffs were in relation to Jessica's remains, it cannot be said that the City acted on their behalf in performing the investigation.

Second, plaintiffs cannot show that the City knew that its inaction could lead plaintiffs to suffer harm. Indeed, the Public Administrator's assumption of responsibility for the

disposition of Jessica's remains at Hart's Island followed from its conclusion that Jessica had no next of kin, which inherently requires the assumption that no such harm could befall any individual, since no such individual exists.

Third, plaintiffs cannot establish that they ever had any direct contact with either the OCME or the Public Administrator. Cases in which direct contact has been held to meet the legal standards for creating a special relationship generally involve lengthy, detailed communications among the relevant parties. See, e.g., Sorichetti v. City of New York, 65 N.Y.2d 461, 470-71 (N.Y. 1985). Here, plaintiffs had no contact with the City whatsoever until the time they discovered Jessica's death in 2011.

Finally, plaintiffs' own testimony indicates that they placed no reliance on the municipality's undertakings. Even assuming arguendo that a Public Administrator's investigation regarding possible next of kin constituted an "affirmative undertaking" of a duty to act for purposes of this prong, plaintiffs could not have relied upon that undertaking because they were at no time aware of that investigation while it was ongoing. To the contrary, the record shows that after Jessica severed ties with her family, while plaintiffs made significant efforts to locate her, they failed to file a missing persons

16

report with the City.  Under these circumstances, they cannot claim reliance on the City's actions.

Based on the foregoing, this Court cannot conclude, as a matter of law, that a special relationship existed between plaintiffs and the City with respect to any emotional injury resulting from the failure to identify plaintiffs as Jessica's next of kin.  As a result, plaintiffs cannot establish the requisite duty necessary to support a claim of negligence against the City.

**2. The City is immune from tort liability because the decision to bury Jessica's remains in the City's cemetery constituted a discretionary act.**

Even assuming <u>arguendo</u> that plaintiffs could establish the existence of a special duty, the City argues that it is entitled to immunity from liability for discretionary actions taken in the course of performing its governmental functions.  For the reasons that follow, we agree.

The special duty rule discussed above, which requires a plaintiff to show the municipality violated a special duty owed to the plaintiff apart from any duty to the general public, operates independently of the governmental function immunity defense, which shields public entities from liability for discretionary actions taken during the performance of governmental functions. The governmental function immunity

defense precludes liability even when all elements of a negligence claim — including duty — have been proved.  See Valdez, 18 N.Y.3d at 75.

The seminal New York case concerning municipal immunity from tort liability is Lauer v. City of New York, 95 N.Y.2d 95 (N.Y. 2000).  There, the Court of Appeals drew a distinction between discretionary and ministerial municipal acts.  A public employee's discretionary acts, comprising "conduct involving the exercise of reasoned judgment," may not result in liability for the municipality, regardless of the degree of the public employee's negligence.  By contrast, ministerial acts of public employees, or acts "requiring adherence to a governing rule," may subject the government to such liability.  Id. at 99 (citing Tango v. Tulevich, 61 N.Y.2d 34, 40-41 (N.Y. 1983)).

We find that the acts challenged here were discretionary governmental functions performed in the exercise of the Public Administrator's reasoned judgment.  At the time that the Public Administrator assumed responsibility for the administration of Jessica's estate, it had information to suggest that Jessica had provided no next of kin information to Columbia Presbyterian (see Fabian Decl. Exs. D, E, F), as well as a certification that no one had claimed her remains from the OCME (see Fabian Decl. Ex. M).  Moreover, while the NYPD could not verify Jessica's

18

identity, it had taken and processed her fingerprints, which did not match any outstanding missing person's report to which they had access. (See Bourne Dep. at 11-2, 14.) Nevertheless, the Public Administrator performed its own investigation to determine whether Jessica had any reasonably available next of kin. Senior Investigator Heit visited Jessica's given address, spoke to her former roommate, and learned that her father, John Kijak, had been present at that apartment to collect her and her belongings. (See Fabian Decl. Ex. T.) Based upon that information, the Public Administrator clearly exercised discretion in determining that Jessica's father was likely aware of her death. (See Bourne Dep. at 34.) It further exercised discretion in determining that, based upon the information it had at that time, no further investigation of John Kijak's whereabouts, or the existence of other next of kin, was necessary or practicable. (See id. at 37, 40-41.) Finally, the Public Administrator exercised its discretion as the administrator of her estate in authorizing her burial at the City's cemetery. (See Espinal Dep. at 46-47.)

This case does not involve a decision about whether to embark on an investigation at all and whether such a decision should be treated as ministerial or discretionary. Once the Public Administrator's office began its investigation, it was

clearly faced with several discretionary decisions concerning whether and what additional investigative steps were warranted. Such decisions are necessarily "based on the exercise of judgment." Mon v. City of New York, 78 N.Y.2d 309, 315 (N.Y. 1991). Thus, the allegedly mistaken decision not to pursue further information after speaking with Mr. Perez was made within the discretion afforded to the Public Administrator's office, as informed by Heit's reasoned judgment that no further investigation was necessary or practicable. While plaintiffs may, in hindsight, disagree with the Public Administrator's determinations, the record shows that the Public Administrator concluded that there was no next of kin reasonably available to collect Jessica's remains. Any attempt to second-guess the City's discretionary determinations in this regard would undermine the purpose of the governmental immunity defense. See Mon, 78 N.Y.2d at 316 (concluding that municipal investigator's judgment concerning information discovered in the course of investigating was entitled to immunity from liability for negligence); see also Tango v. Tulevech, 61 N.Y.2d 34, 40-42 (N.Y. 1983).

Plaintiffs' reliance on Shipley v. City of New York, 80 A.D.3d 171 (2d Dep't 2010), is misplaced. (See Pl. Opp'n at 5.) That case involved the failure to notify an identified next of

kin.  See id. at 178.    Here, we have an unidentified next of kin, as well as a limited degree of identification of the decedent herself.   Thus, plaintiffs' arguments do not undermine our conclusion that the investigation of Jessica's possible next of kin was a discretionary act for which no negligence liability can attach.

3. **Plaintiffs cannot establish a violation of the PHL because the disposition of Jessica's remains was lawfully executed pursuant to the Public Administrator's statutory authority.**

Finally, the City argues that plaintiffs cannot support its loss of sepulcher or statutory violation claims because the City acted within its statutory authority pursuant to the PHL when it assumed the administration of Jessica's estate and arranged for the disposition of her remains at the City's cemetery.  (Def. Mem. at 18.)

In New York,[6] the common law right of sepulcher is defined as the next of kin's "absolute right to the immediate possession of a decedent's body for preservation and burial."  Melfi v. Mt. Sinai Hosp., 64 A.D.3d 26, 31 (1st Dep't 2009); see also Estate of Scheuer v. City of New York, 10 A.D.3d 272, 274-75 (1st Dep't 2004); Booth v. Huff, 273 A.D.2d 576 (3d Dep't 2000).   Damages may be awarded against any person who unlawfully interferes with

---

[6] Because this Court has jurisdiction over the instant action pursuant to the diversity statute, 28 U.S.C. § 1332, we apply the substantive law of the State of New York to all matters governed by state law.  See Erie R.R. v. Tompkins, 304 U.S. 64, 78 (1938).

that right or otherwise improperly deals with a decedent's body. <u>Melfi</u>, 64 A.D. at 31. The right of sepulcher is recognized as "less a quasi-property right and more the legal right of the surviving next of kin to find solace and comfort in the ritual of burial." <u>Id.</u> As a result, courts have found that a cause of action cannot accrue until the interference with the right directly impacts on the "solace and comfort" of the next of kin – that is, until the interference causes the living kin mental anguish. <u>Id.</u> at 32; <u>see</u> <u>Henderson v. Kingsbrook Jewish Med. Ctr.</u>, 91 A.D.3d 720, 721 (2d Dep't 2012).

In order for the right of sepulcher to accrue, (1) there must be interference with the next of kin's immediate possession and (2) the interference must cause mental anguish. <u>Melfi</u>, 64 A.D. at 39. Interference may arise from unauthorized autopsy, <u>see</u> <u>Darcy v. Presbyterian Hosp. in City of N.Y.</u>, 202 N.Y. 259, 262-63 (N.Y. 1911), inadvertent disposal of the decedent's remains, <u>see</u> <u>Finley</u>, 220 N.Y. at 257-58; <u>Correa v. Maimonides Med. Ctr.</u>, 165 Misc.2d 614 (N.Y. Sup. 1995), or the failure to notify the listed next of kin of a decedent's death. <u>See</u> <u>Melfi</u>, 64 A.D. at 39. In these circumstances, the next of kin's mental anguish is generally presumed, but the cause of action does not accrue until she is aware of the interference with her right to the possession of her loved one. <u>See</u> <u>id.</u> If a violation of the

right of sepulcher is established, the next of kin may be compensated for the emotional suffering and mental anguish which they experienced as a result.  See Shipley v. City of New York, 80 A.D.3d 171, 908 N.Y.S.2d 425).  However, in order to recover for such emotional injuries, it must be shown that the injuries were the natural and proximate consequence of some wrongful act or neglect on the part of the one sought to be charged.  See Mack v. Brown, 82 A.D.3d 133, 139 (2d Dep't 2009).

Although the common law right of sepulcher gives a decedent's next of kin the "absolute right to the immediate possession of a decedent's body for preservation and burial," Melfi, 64 A.D.3d 26, 31 (1st Dep't 2009), PHL § 4201 has supplemented that right in setting forth a prioritized list of individuals who presumptively have the right to direct the disposition of a decedent's remains.  See Nesbit v. Turner, 15 A.D.3d 552, 553 (2d Dept 2005); Matter of Caseres v. Ferrer, 6 A.D.3d 433, 433-34 (2d Dept 2004); Maurer v. Thibeault, 20 Misc.3d 631, 632 (Sup. Ct. Cortland Cty. 2008).  In descending priority, the persons who have the right to dispose of a decedent's remains in the absence of a written instrument of designation are as follows: the surviving spouse or surviving domestic partner; any of the decedent's surviving children 18 years of age or older; either of the decedent's parents; any of

23

the decedent's surviving siblings 18 years or older; a court-
appointed guardian; a person 18 years of age or older entitled
to share in the estate with the person closest in relationship
having the highest priority; a duly-appointed fiduciary of the
estate; a close friend or other relative of the decedent
reasonably familiar with the decedent's wishes; and a chief
fiscal officer of a county or duly-appointed public
administrator.  See PHL § 4201(2)(a)(i)-(x).  If an enumerated
individual is not reasonably available, is unwilling, or is not
competent to serve, and is not expected to become reasonably
available, willing, or competent, then persons of equal priority
or, if there are none, persons of the next succeeding priority
have the right to control the disposition of the decedent's
remains.  See id. § 4201(2)(b).  The statute also provides that
"[a] person acting reasonably and in good faith, shall not be
subject to any civil liability for ... disposing of a decedent's
remains if done with the reasonable belief that such disposal is
consistent with this section." See PHL § 4201(6).

Based on the plain language of PHL § 4201, we conclude that
the Public Administrator properly assumed the administration of
Jessica's estate.  The plain language of section 4201 lists the
individuals who have the right to claim a decedent's remains, in
order of their priority, and makes clear that the Public

Administrator is legally authorized to control the disposition of a decedent's remains in the absence of an individual with higher priority. See PHL § 4201(2)(b). Thus, plaintiffs' argument that "all of Jessica Kijak's living relatives, and even close friends or roommates, would have had priority over the Public Administrator" (Pl. Opp'n at 9) overlooks the provision's assumption that such individuals may claim priority only if they have made themselves known or are readily ascertainable. See PHL § 4201(2)(b) ("If an enumerated individual is not reasonably available, is unwilling, or is not competent to serve, and is not expected to become reasonably available, willing, or competent, then persons of equal priority or, if there are none, persons of the next succeeding priority have the right to control the disposition of the decedent's remains.")

It cannot be disputed that the Public Administrator was unaware of plaintiffs' existence at the time it assumed the administration of her estate. Nor did plaintiffs make themselves known to the relevant municipal authorities. Concededly, they were not aware of Jessica's death until 2011, but they earlier failed to take actions following her disappearance which might have alerted the City or the NYPD of their relation to her. For example, plaintiffs reported Jessica as a missing person to the Doe Network, a private organization

and the New Jersey Police Department, but did not report her as missing to the NYPD, despite their suspicions that she might be in New York (see C. Kijak Dep. at 39-41; P. Kijak Dep. at 22, 24, 26-27), nor to the FBI or any other federally-maintained missing persons database. Thus, plaintiffs cannot show that the City usurped the administration of Jessica's estate from a readily available, higher priority individual.

Having established that the Public Administrator properly assumed administration of Jessica's estate, we conclude that it acted within its statutory authority in authorizing the OCME to arrange for her burial at the City's cemetery. The Public Health Law provides that no liability shall attach to actions "taken reasonably and in good faith" to carry out the directions of a person entitled to control the disposition of remains. See PHL § 4201(7); see also Mack v. Brown, 82 A.D.3d 133, 139 (2d Dep't 2009) (finding that defendants "did not violate the plaintiffs' alleged right of sepulcher, as its actions concerning the decedent's cremation were taken reasonably and in good faith and in compliance with PHL § 4201(7)").

Applying that standard here, we find that the record supports the City's argument that the Public Administrator made reasonable efforts to locate Jessica's potential relatives. While Jessica purposefully failed to supply next of kin

information to Columbia Presbyterian, the Public Administrator investigated all the information that she did provide.  Further, based on Russell Heit's visit to the Bronx address, the Public Administrator concluded that Jessica's father was aware of her death and had elected not to claim her body, a contention that plaintiffs do not contest and which the record supports. Obviously, the investigators had no way of knowing that Perez was lying.  Finally, the office completed a change of address form with the U.S. Postal Service in order to collect contact information from any of Jessica's relatives or friends.  Despite these efforts, no further next of kin were discovered. Jessica's admission to Columbia Presbyterian without identifying documents, her declination to provide next of kin identity, and her longstanding estrangement from her family created a perfect storm of circumstances under which it was it was reasonable for the City to conclude its investigation when it did.

Moreover, we simply cannot agree with plaintiffs' assertion that reasonable efforts necessarily includes a "simple internet search" (Pl. Opp'n at 4) in all cases.  While a basic Google search for "John Kijak" may have led to a manageable number of results, the same search for "John Smith" certainly would not. It is hardly clear what the City should do if it finds a possible match or lead, given the obviously horrific

27

consequences from an erroneous notification concerning the possible death of a family's loved one.  Put simply, requiring the City to make such efforts to locate next of kin for all unverified and unclaimed decedents would be impracticable or far worse.

To find that the City acted unreasonably, we would either have to find a deviation from a general standard, which plaintiffs have not begun to establish exists, or engage in a case by case evaluation.  As noted earlier, the unique facts here are more than sufficient to sustain the reasonableness of the City's actions.  While we in no way question that Jessica's death and its aftermath caused her family pain, it must be remembered, especially in this legal context, that the tragedy began well before her death.  Accordingly, we find that, as a matter of law, plaintiffs cannot succeed on their loss of sepulcher or statutory violation claims.

## CONCLUSION

For the aforementioned reasons, the City's motion for summary judgment is granted.  The Clerk of the Court is directed to terminate the motion pending at docket number 15 and close this case.

SO ORDERED.

DATED:      New York, New York
            September 20, 2013

NAOMI REICE BUCHWALD
UNITED STATES DISTRICT JUDGE

        Copies of the foregoing Order have been mailed on this date
to the following:

**Attorney for Plaintiffs**
James K. Greenberg, Esq.
Greenberg & Greenberg, LLP
363 Seventh Avenue, Suite 500
New York, N.Y. 10001

**Attorney for Defendant City of New York**
Sosimo J. Fabian, Esq.
Office of the Corporation Counsel
City of New York
100 Church Street
New York, N.Y. 10007